Nicholas T. VEGA, et al., Appellants,

v.

UNITED STATES, Appellee.

Nos. 95–CO–1558, 95–CO–1654, 95–CO–1678, 95–CO–1679, 95–CO–1692, 95–CO–1693, 95–CO–1715, 95–CO–1785, 95–CO–1786.

District of Columbia Court of Appeals.

Argued Feb. 11, 1998.

Decided April 2, 1998.

Elizabeth R. Dewey, with whom Sheldon Krantz, was on the brief, Washington, DC, for appellants.

Ann Rosenfield, Assistant United States Attorney, with whom Mary Lou Leary, United States Attorney at the time the brief was filed, and John R. Fisher and Elizabeth Trosman, Assistant United States Attorneys, were on the brief, for appellee.

Before FARRELL, KING, and RUIZ, Associate Judges.

FARRELL, Associate Judge:

These nine defendants appeal from their convictions on retrial for unlawful entry and the preceding denial of their motions to dismiss on double jeopardy grounds. The retrial was occasioned because the judge at the first trial declared a mistrial on grounds of "manifest necessity." [1] The judge did so after the defendants' jointly-retained attorney failed to appear in court to give closing argument, conduct which the judge had foreseen as the likely culmination of extreme emotional distress the attorney had exhibited over the previous two days. At the time the judge ordered a mistrial the defendants, as a practical matter, were unrepresented by

---

1. The defendants noted interlocutory appeals from the denial of their motions to dismiss, *see Abney v. United States*, 431 U.S. 651, 97 S.Ct. 2034, 52 L.Ed.2d 651 (1977), but the appeals were all dismissed by this court as untimely filed. Although the defendants thus relinquished a key protection afforded by the Double Jeopardy Clause—the ability to contest in advance "the very authority of the Government to hale [them] into court to face trial on the charge against [them]," *id.* at 659, 97 S.Ct. at 2040—the government does not dispute their entitlement to raise the double jeopardy claim on appeal from their subsequent convictions.

counsel. The judge did not appoint substitute counsel to advise them of their options, and did not inquire of them, individually or collectively, whether they wanted a mistrial or instead wished to proceed to verdict despite the limitations imposed by their attorney's effective withdrawal from the case.

We appreciate the quandary in which the trial judge found herself near the end of a nine-day trial, and we do not question her good faith in believing that only a mistrial could insure the defendants a trial in which they were represented effectively by counsel through the critical stage of closing argument. We nonetheless are compelled to hold that the judge, by essentially leaving the defendants out of the mistrial decision in a case where the paramount if not sole prejudice affecting the proceedings was to the defendants themselves, failed to exercise the sound discretion double jeopardy requires before a mistrial may be ordered on grounds of manifest necessity. Retrial of the defendants, therefore, was barred by double jeopardy.

## I.

Appellants' joint trial for unlawful entry began on September 20, 1993. They were represented by a single retained counsel. Over the next week the government presented testimony by officials of the Cameroon Embassy[2] and United States Secret Service officers regarding the circumstances of the defendants' entry of the embassy on October 27, 1992. In each case defense counsel cross-examined the witnesses with a view toward establishing, *inter alia,* a defense that the defendants reasonably believed they had been allowed entry. At a later point the trial judge remarked that counsel's cross-examination and presentation of the case generally "was perfectly adequate."

On the morning of September 27, 1993, before the case was called, defense counsel approached the bench and asked permission to withdraw from the case. Somewhat vaguely, she referred to "a conflict between myself and my clients" stemming from certain (unidentified) things they had not told

her which had led her to think "this was one type of case when actually it's another." Counsel further confessed to having misrepresented her "working knowledge of French" and previous trial experience, stating that this was her first jury trial:

> I got in over my head; and, as the case unfolded, I saw that there were multiple defenses that arose that I did not know about prior to the commencement of this trial.

> I also have a hard time making my clients understand that we have different rules and I am being stressed out.

> \* \* \* \* \* \*

> I was in over my head. I needed somebody to assist me so that I could follow the testimony; because I realize that that was part of the downfall I was having in doing so throughout the course of this trial. I just—I just can't go forward on this. There's no way.

The judge replied that "it's a fairly straightforward case at bottom, even though [there are] nine co-defendants," and that "regardless of what you've done so far, I don't know that it's been ineffective.... I don't think there's ineffective assistance of counsel." Observing that counsel was accompanied at the moment by an attorney from the Public Defender Service, the judge suggested that counsel might be suffering from "the jitters of a first trial" and should talk to this counsel and those who were advising her. Later the court accepted the PDS attorney's suggestion that the case be continued overnight so counsel could confer with her clients and "just collect herself."

The next day one of the defendants, Nicholas Vega, testified on direct examination and was cross-examined. After a lunch recess and out of the jury's presence, defense counsel told the judge that "my clients are dissatisfied in some way with the way things have been proceeding." Noticing that one defendant was shaking his head "no" to this remark, the judge inquired of each defendant whether he was satisfied with counsel's representation; all responded affirmatively, only one claiming that counsel's assertion of a rift

2. These witnesses apparently testified through a French language interpreter.

was "taking me by total surprise" and that he needed time out for her "to enlighten me on why she thinks that we are not satisfied." After a recess counsel returned and again voiced her concern that the defendants were "suggest[ing] that perhaps I'm not myself, that I didn't put forth my best effort." The judge again asked the defendants if they were satisfied with counsel's services, and all answered "yes." During the ensuing discussion of jury instructions defense counsel was largely silent, the judge having to prod her repeatedly for her views.

When the judge then asked defense counsel if she was ready to give her closing argument,[3] counsel replied, "I am not prepared to go forward.... I just cannot go forward." She referred to "communications that were related to me [by the defendants] in the outer chambers of this courtroom," which she had to keep confidential but which revealed that "I'm getting something entirely different outside of the courtroom and another indication inside." Reminding counsel that the clients had expressed satisfaction with her services, and remarking that "this is a very straightforward simple case," the judge directed her to proceed to argument. Counsel at first asked for an opportunity to review the jury instructions overnight, then stated:

> Your Honor, I'm not well at this point. I really don't know what's going on. I'm not well[;] I'm just not.
>
> *   *   *   *   *   *
>
> I have no idea, as far as what's going on in the proceedings ... I have no idea, as far as what has transpired from when we first made the break where my first witness Nicholas Vega just stepped down from the stand. After that point of time, I have no idea as to what transpired. And that's why I'm not able to go forward to give a closing argument. I can't pull it together. I don't know what has happened.

Repeating that she could not remember anything "relating to the jury instructions," she again said, "I just can't go forward. It's impossible." The judge recessed the proceedings until the next day.

The next morning defense counsel did not appear. In her place was an attorney who had previously practiced from the same office and was there "to protect her interest and her right." He reported that she had "had a breakdown" which he had "seen ... coming on for some time"[4] and which had caused her to seek medical treatment the night before at a hospital. He recommended a mistrial. The judge replied that she frankly had not expected defense counsel to appear that morning because counsel "was an extremist [*sic; in extremis*] yesterday." Some of the defendants, the judge stated, had told her courtroom clerk that "they were going to request new counsel." From the report of counsel's fellow attorney (including a hospital record) and from the judge's own observations, the judge was convinced that defense counsel "was definitely having mental problems during the trial and unable to conduct herself." Moreover, she disbelieved counsel's earlier representation that the defendants had made contradictory assertions to her. Since "there's obviously a medical problem," the judge opined, "a mistrial is clearly required." But she reserved judgment and recessed the matter until later that morning.

When the proceedings resumed the government strongly opposed a mistrial, stating that the judge knew too little about defense counsel's condition and whether she could continue. The judge read into the record the hospital report of counsel's treatment the previous night, which included a prescription for anti-depression medication and an instruction against any "court or office activity until seen by" a psychiatrist to whom she had been referred. In response to the judge's observation that, "in essence, we have a situation where the defendants are left in a position of going *pro se*," one defendant (Vega) volunteered, "Your Honor, I don't think we have the background to make that kind of a presentation," and expressed bewilderment over defense counsel's actions.

---

**3.** The judge elicited from each remaining defendant that he did not wish to testify.

**4.** He also suggested that she had been "hallucinating ... over the last two weeks."

The trial judge then declared a mistrial, stating her reasons as follows:

> Well, I am loathe to do this, because I think that the cross examination that occurred was perfectly adequate, and I think the presentation of the case was perfectly adequate. I do not know that there was ineffective assistance of counsel that occurred on the basis of the record.
>
> But, on the other hand, I think it's absolutely impossible to keep this jury any longer. I think it's prejudicial to both sides to keep the jury sitting any longer at this point. That the Court has taken now—we didn't sit Friday. We didn't sit Monday, because of defense counsel's problems. We basically didn't sit yesterday, except for one hour, because of the problems of defense counsel.
>
> I think it's impossible for someone to step in and read the transcript and then make an argument. While it could be done, it would entail holding the jury for some time. Obviously, the transcript takes a while to get prepared. There is no way, practically, to hold the jury.
>
> I think that there has been a breakdown in communication. I mean, given what the Court observed with defense counsel, with Public Defender Service coming in on Monday morning ... on defense counsel's behalf, to ask for the continuance on Monday so that defense counsel could gather herself, that in light of the problems that the Court even had communicating with defense counsel at times, the representations that were made by defense counsel, that later turned out to be false, that if the Court was having that problem, then I think it's reasonable to assume that, regardless of how effective a question or questioning might have been, that the clients have difficulty communicating, and they may not have been aware that they were having difficulty. It could have been

a one-way street where they thought they were communicating, but the lawyer was not picking it up.

Again finding "that there was something seriously wrong going on" with defense counsel, the judge concluded:

> I don't think it's fair to the defendants. I think it would be a manifest injustice for the defendants to go forward, and to have another counsel step in at this point, and the—and I think there's a manifest necessity, as a result of that, to go ahead and grant the mistrial. And I do so, obviously, with great regret.

## II.

■ When a criminal accused has not requested a mistrial, the trial judge may declare one consistent with the Double Jeopardy Clause only if "there is a manifest necessity for the act, or the ends of public justice would otherwise be defeated." *United States v. Perez,* 22 U.S. (9 Wheat.) 579, 580, 6 L.Ed. 165 (1824). This standard, which entails a "high degree" of necessity, *Arizona v. Washington,* 434 U.S. 497, 506, 98 S.Ct. 824, 830, 54 L.Ed.2d 717 (1978), requires a twofold inquiry by the trial court. First, the circumstances necessitating the mistrial must be "extraordinary" ones, "sufficient to override the defendant's double jeopardy interests."[5] *Douglas v. United States,* 488 A.2d 121, 132 (D.C.1985) (citations omitted). Second, "the trial judge must determine whether an alternative measure—less drastic than a mistrial—can alleviate the problem so that the trial can continue to an impartial verdict." *Id.* On appeal the government "bears a heavy burden to justify the mistrial decision," and "a reviewing court must resolve any doubt in favor of the liberty of the citizen." *Id.* at 133 (citation and internal quotation marks omitted). On the other hand, this court "ordinarily will accept a trial judge's determination that there is a 'high

---

5. Those interests are summed up in the defendant's "valued right to have his trial completed by a particular tribunal." *Wade v. Hunter,* 336 U.S. 684, 689, 69 S.Ct. 834, 837, 93 L.Ed. 974 (1949). The right "merits constitutional protection," the Supreme Court has stated, because [e]ven if the first trial is not completed, a second prosecution may be grossly unfair. It increases the financial and emotional burden on the accused, prolongs the period in which he is stigmatized by an unresolved accusation of wrongdoing, and may even enhance the risk that an innocent defendant may be convicted. *Arizona,* 434 U.S. at 503–04, 98 S.Ct. at 829 (footnotes omitted).

degree of necessity' for a mistrial, without a less drastic alternative, as long as that determination is reasonable." *Id.* (citations omitted). "Reasonable[ness]," in this context, means ultimately whether the judge exercised "sound discretion," *Arizona,* 434 U.S. at 514, 98 S.Ct. at 835, in rejecting lesser measures in favor of a mistrial.

Applying these principles, we first agree that the trial judge reasonably determined that the return of retained counsel to deliver closing argument was not a realistic alternative. The attorney who appeared in court to "protect [counsel's] interest and right" represented that she had "had a breakdown," was under referral to a psychiatrist, and had been acting bizarrely—"hallucinating"—over the previous two weeks. The judge's own observations confirmed counsel's "extreme" behavior in the past three days, linked specifically to the impending task of delivering closing argument. The judge's recognition that something was "seriously wrong" with counsel in turn supported a reasonable conclusion that counsel could not resume the representation even if the defendants should want her to, at least without an unacceptable delay of proceedings that had already been interrupted several times.

■ But even though, as a practical matter, retained counsel had withdrawn from the case, the judge still was obligated to consider whether measures short of a mistrial were available to remedy the problem. In deciding whether she did so with the care necessary to satisfy double jeopardy concerns, we regard two features of this case as critical. First, the paramount if not only reason why the judge ordered a mistrial was concern for the defendants, who had suffered "a breakdown in communication with"—not to say abandonment by—their attorney as a result of her mental distress. Although the judge's need to deal with counsel's behavior had kept

the jury on hold for more than a day, nothing had occurred that affected its ability to decide the case fairly *other than* that counsel's condition made the quality of her representation problematical[6] and greatly endangered the defendants' right to receive an effective closing argument. Second, in deciding that this prejudice to the defendants necessitated a mistrial, the judge essentially left the defendants out of the decision. She did not ask them, individually or collectively, if they wanted a mistrial or instead wished to proceed to verdict despite the limitations imposed by counsel's departure.[7] Still more importantly, since the defendants were effectively unrepresented by counsel when she ordered the mistrial,[8] it is not apparent how they could have intelligently evaluated their options and been heard on the decision, either personally or through counsel. These combined circumstances leave us unable to conclude that the judge exercised the informed discretion which double jeopardy requires in this context.

The judge had before her, at least in theory, the following remedies short of a mistrial after concluding that retained counsel was gone from the case:

1. Appoint, or allow retention of, new counsel and give her as much time as needed to order and read the transcript and prepare to deliver closing argument.

2. Permit new counsel to give closing argument, but within narrowly restricted time limits—requiring her to rely either on the tape recording of the trial testimony (if available) or on a selective reading by the court reporter of the notes of the testimony.

3. Permit the defendants to deliver their own closing arguments.

4. Permit the defendants to waive closing argument.

---

6. When the prosecutor pointed to the judge's repeated observation that counsel had rendered effective representation before the jury, the judge replied: "Well, except that we don't know what has occurred outside of the presence of the jury, in terms of other available testimony that could have been presented."

7. Only at one point did a single defendant comment that he did not think the defendants had

the background to proceed with closing argument unrepresented by counsel.

8. By retaining counsel, the defendants had exercised their "right to rely on counsel as a 'medium' between [themselves] and the State." *Maine v. Moulton,* 474 U.S. 159, 176, 106 S.Ct. 477, 487, 88 L.Ed.2d 481 (1985).

The first alternative was one in theory only. The judge considered and ruled out the option of appointing counsel and waiting as long as necessary to prepare the trial transcript so that counsel could assimilate it and prepare argument. As the judge pointed out, she had already had to "keep the jury sitting" for portions of three days, and "[o]bviously, the transcript takes a while to get prepared." The judge thus reasonably rejected the first alternative.[9]

As to the remaining alternatives, however, the judge did not consult with the defendants about them and, more importantly, did not afford them an opportunity to confer with substitute counsel about the availability of those options.[10] Had they had that opportunity, it is at least conceivable they would have chosen one of them, preferring a verdict from a jury believed sympathetic to their cause to the alternative of another lengthy trial. Had they been willing, for example, to let replacement counsel deliver closing argument with only a day, or even hours, to confer with them about their defense and the points to be made to the jury, we could not reasonably find a refusal to allow them that choice compatible with their double jeopardy rights. Indeed, had they elected—after consulting with new counsel—to deliver their own closing arguments rather than surrender the fruits of what they believed was an effective challenge to the government's proof so far, it is not apparent how the court could have denied them that choice. *Cf. Faretta v. California,* 422 U.S. 806, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975). Finally, we have referred to the defendants consistently as "they" and "them," but in fact the valued right of each of them individually "to have his trial completed by a particular tribunal" was at stake, *Wade,* 336 U.S. at 689, 69 S.Ct. at 837, and each had a corresponding right to be heard on the issue at least through counsel.

The federal court of appeals for this circuit has stated:

> The nature of the adversary process requires that defense counsel be accorded a meaningful participation and hearing ... in a decision to declare a mistrial based on manifest necessity. The decision is of great significance, involving as it does the defendant's constitutional right to be protected from double jeopardy. There is a corollary right for an effective opportunity to explore alternatives before the constitutional right is held to be inapplicable because of manifest necessity. The requirement of hearing from defense counsel prior to a mistrial decision is not a mere formality.

*United States v. Lynch,* 194 U.S.App.D.C. 213, 217, 598 F.2d 132, 136 (1978) (footnote omitted). Indeed, the Supreme Court in *Arizona, supra,* in concluding that the trial judge "did not act precipitately" in ordering a mistrial, emphasized that the judge had "evinc[ed] a concern for the possible double jeopardy consequences of an erroneous ruling" by "[giving] both defense counsel and the prosecutor full opportunity to explain their positions on the propriety of a mistrial." *Id.* at 515–16, 98 S.Ct. at 835. In this case, as we have pointed out, the concern motivating the mistrial decision was a failure of the defendants' right to effective representation; it was not, as in *Arizona,* conduct threatening "society's interest in giving the *prosecutor* one complete opportunity to convict those who have violated its laws." *Id.* at 509, 98

9. The judge's remark that "it's absolutely impossible to keep this jury any longer" must be understood in light of her accompanying statement that "[t]here [was] no way, practically, to hold the jury" long enough to obtain preparation of the transcript. A blanket determination that the jury could not be held longer even to let the defendants consult interim counsel about remaining options would itself have been "precipit[ous]," *Arizona,* 434 U.S. at 515, 98 S.Ct. at 835, and hence an abuse of discretion. This is not a case such as *Powers v. United States,* 412 A.2d 1205 (D.C.1980), where failure to order a mistrial would have meant further interruption of jury deliberations for nearly a week, with the resultant "risk of jury contamination, enhanced by each day it was in recess." *Id.* at 1207.

10. While the judge herself explained to the defendants what a mistrial entailed (*i.e.,* that a new trial would take place, before which they would "be presumably securing new counsel"), that was not a substitute for affording them, with the advice of counsel, at least a limited opportunity to weigh this option against other available ones.

S.Ct. at 832 (emphasis added).[11] Yet in balancing the defendants' right to fully satisfactory representation against their interest in a verdict by this jury, the judge left the uncounseled defendants essentially out of the decision. That was constitutional error.

The government responds that the failure to consult the defendants on their preferences ultimately did not matter because the public interest in "fair trials designed to end in just judgments," *Wade,* 336 U.S. at 689, 69 S.Ct. at 837, must allow a judge to prevent a debacle of the sort the defendants faced here—the need to present closing argument without the aid of counsel closely familiar with the evidence.[12] The argument sweeps too broadly. In *Douglas, supra,* the government similarly argued that the judge must be allowed to override a defendant's desire to waive his attorney's conflict of interest, one that, in *Douglas,* "would have adversely affected [counsel's] ability to render effective assistance to [the defendant] at trial." 488 A.2d at 137. We rejected that argument as incompatible with the defendant's right to counsel of choice and, more broadly, "to make decisions central to the defense which is inherent in the structure of the Sixth Amendment and in our notions of due process under the Fifth Amendment." *Id.* at 142. Protecting "the defendant's right to effective assistance of counsel" at the expense of this autonomy, we said, "would be patronizing toward defendants and would rob them of their right to choose freely how to present themselves before the law." *Id.* at 144. So too, if the defendants in this case were foreclosed from choosing an admittedly improvised closing argument by replacement counsel on short notice, or one delivered *pro se,* or even none at all over the alternative of a mistrial, we would turn "[w]hat were contrived as protections for the accused [against ineffective assistance of counsel] . . . into fetters." *Adams v. United States ex rel. McCann,* 317 U.S. 269, 279, 63 S.Ct. 236, 242, 87 L.Ed. 268 (1942).

We need not consider a case, hypothesized at oral argument, where the judge's action responded to a failure of the attorney-client relationship so complete or pervasive as to deprive the trial fundamentally of "its character as a confrontation between adversaries." *United States v. Cronic,* 466 U.S. 648, 657, 104 S.Ct. 2039, 2046, 80 L.Ed.2d 657 (1984). Even there it would be a close question whether "the public's interest in maintaining the integrity of the criminal justice system," *Douglas,* 488 A.2d at 131, allows the judge to override the defendant's desire nonetheless to proceed to verdict with the assembled jury. No such pervasive failure occurred here. The judge could not identify any ineffectiveness in counsel's examination of the government's witnesses, and while she surmised that counsel's illness might have caused counsel to omit some unidentified testimony, *see* note 6, *supra,* her principal concern was the defendants' plight in facing closing argument. As to that, she could not exclude them from the remedial decision.

The government *is* right that, in cases such as this, the public has a strong interest in assuring that a conviction entered after the defendant has chosen to proceed to verdict is not vulnerable to collateral attack. But, provided the defendant has been advised by counsel of his options, including a mistrial, there is no reason to believe the resultant choice will be assailable as involuntary. *See United States v. Dinitz,* 424 U.S. 600, 609, 96 S.Ct. 1075, 1080, 47 L.Ed.2d 267 (1976) ("The important consideration, for purposes of the Double Jeopardy Clause, is that the defendant retain primary control over the course to be followed in the event of . . . error."); *see also McGautha v. California,* 402 U.S. 183, 213, 91 S.Ct. 1454, 1470, 28 L.Ed.2d 711 (1971) ("Although a defendant may have a right, even of constitutional dimensions, to follow whichever course he chooses, the Constitution does not by that token always forbid requiring him to choose.").

**11.** In *Arizona,* "the public interest" in "just judgment[s]" was endangered by an improper opening statement of defense counsel. *Id.* at 510, 98 S.Ct. at 832.

**12.** *Cf. Herring v. New York,* 422 U.S. 853, 95 S.Ct. 2550, 45 L.Ed.2d 593 (1975) (explaining importance of closing argument to the adversary factfinding process).

### III.

For the reasons stated, we hold that the judge failed to exercise sound discretion before "foreclos[ing] appellant[s]' option to go to the first jury." *Douglas,* 488 A.2d at 145 (citation omitted). Double jeopardy therefore requires that the informations be dismissed.

*So ordered.*

---

Andrew S. Kasmer, Greenbelt, MD, for petitioner.

Donald P. Maiberger, Rockville, MD, for intervenors.

Jo Anne Robinson, Interim Corporation Counsel, and Charles L. Reischel, Deputy Corporation Counsel, filed a statement in lieu of brief for respondent.

Before TERRY, STEADMAN and REID, Associate Judges.